(1)

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF
OCALA FLORIDA

2022 MAR 31 AM 10: 57

FILED

JOHN MATTHEW GAYDEN, JR. M.D.
PETITIONER, PRO SE

V                           CIVIL CASE #
                            5:22-CV-171- BJD-PRL

STEPHEN CLEMENTS ACTING WARDEN,
FCC COLEMAN LOW
   INDIVIDUALLY AND OFFICIALLY
U.S. ATTORNEY GENERAL
   CIVIL DIVISION
   INDIVIDUALLY AND OFFICIALLY
CIVIL COMPLAINT       NO JURY DEMAND
PRO SE PRISONER

CAUSE: 28 U.S.C. 1331 FEDERAL QUESTION: BIVENS ACT
ACTION UNDER BIVENS V. SIX UNKNOWN FEDERAL
NARCOTICS AGENTS, 403 U.S. 388 (1971)
NATURE OF SUIT 555 PRISONER PETITIONS
(PRISON CONDITIONS/MONETARY DAMAGES. FOR
UNCONSTITUTIONAL CONFINEMENT.

(2)

CITATIONS OF AUTHORITY

(1) 28 U.S.C. 1331 FEDERAL QUESTION: BIVENS ACT
ACTION UNDER BIVENS V. SIX UNKNOWN
FEDERAL NARCOTICS AGENTS, 403 U.S. 388(1971)
NATURE OF SUIT 555 PRISONER PETITIONS.
PRISON CONDITIONS/MONETARY DAMAGES/ UNCONSTITUTIONAL
CONFINEMENT
JURISDICTION: U.S. GOVERNMENT DEFENDANTS.
ALL 1983 CIVIL RIGHTS CLAIMS FALL UNDER
BIVENS ACTION. THIS IS A FIRST, FOURTH, FIFTH, SIXTH,
EIGHTH, AND FOURTEENTH CLAIM FOR UNCONSTITUTIONAL
CONDITIONS OF CONFINEMENT AND VIOLATION OF
CONSTITUTIONAL RIGHTS,

(2) VIOLATION OF ATTORNEY GENERAL MERRICK
GARLANDS FEDERAL LAW 12-21-2021 GRANTING
GAYDEN COMPASSIONATE RELEASE UNDER
18 U.S.C. SECTION 3582(C)(1)(A)(i) "EXTRAORDINARY
REASONS/ COMPELLING REASONS AND "OTHER REASONS"
GARLAND ORDERED THAT GAYDEN, 68 YEARS OLD, WITH
HIGH RISK FACTORS OF CONTRACTING COVID-19 BECAUSE
OF VULNERABILITY TO SEVERE ILLNESS AND DEATH
FROM (FTD) FRONTAL-TEMPORAL DEMENTIA AND
HYPERTENSION (EXHIBITS) &ISTED BY THE CDC (EXHIBIT C),

(3)

## CITATIONS OF AUTHORITY

ARE ALL THAT IS REQUIRED. GAYDEN'S LENGTH OF
SENTENCE AND AMOUNT OF TIME SERVED NO LONGER
PREVENTS GAYDEN FROM HOME CONFINEMENT. THE
EXPANDED MODIFICATION OF THE "CARES ACT", PUB. L.
NO 116-136  12003(b)(2) AND 12003(2) STAT. 281, 516 IS
BASED ON THE COVID-19 RETERNAL PANDEMIC AND
AFTERWARD. THIS INTERVENING NEW FEDERAL
LAW HAS SUBSTACTAL CONTROLLING EFFECT. RESPONDENTS
DENIAL IS DELIBERATE INDIFFERENCE WHICH CONSTITUTE
A VIOLATION OF THE EIGHTH CONSTITUTIONAL AMENDMENT
HOLDING CRUEL AND UNUSUAL PUNISHMENT DUE TO
PRISON CONDITIONS AND UNCONSTITUTIONAL CONFINEMENT.

(3)  VIOLATION OF UNITED NATIONS ACCEPTED PRINCIPALS
OF NELSON MENDRELLA'S RULES ON HUMAN RIGHTS
AND GAYDEN'S FEDERAL INMATE HANDBOOK. (2002).

(4)  [ARTICLE I, SECTION 10] "AMENDMENTS".

(5)  THE FIRST CONSTITUTIONAL AMENDMENT OF THE U.S.

(6)  THE FOURTH CONSTITUTIONAL AMENDMENT OF THE U.S.

(7)  THE FIFTH CONSTITUTIONAL AMENDMENT OF THE U.S.

(8)  THE SIXTH CONSTITUTIONAL AMENDMENT OF THE U.S.

(9)  THE EIGHTH CONSTITUTIONAL AMENDMENT OF THE U.S.

(10)  THE FOURTEENTH CONSTITUTIONAL AMENDMENT OF THE U.S.

(4)

VIOLATION OF THE FIRST AMENDMENT OF
THE CONSTITUTION RELAVANT PART:
"CONGRESS SHALL MAKE NO LAW RESPECTING ...
FREEDOM OF SPEECH ,,, AND TO PETITION THE
GOVERNMENT FOR THE REDRESS OF GRIEVANCES"

VIOLATION OF THE FOURTH AMENDMENT
OF THE CONSTITUTION RELAVANT PART:
" THE RIGHT OF THE PEOPLE TO BE SECURE IN
THEIR PERSONS, HOUSES ,,,"
                    GAYDEN
DEPRIVING ~~THE~~ OF A BASIC FACILITY THAT IS
SAFE TO LIVE IN AND DEPRIVING GAYDEN OF
BASIC MEDICAL CARE AND NEEDS VIOLATES THE
FOURTH ~~AMENDMENT OF THE CONSTITUTION~~
AND FIFTH AMENDMENT OF THE
CONSTITUTION. BY THE RESPONDENTS ACTIONS AND
INACTIONS" ACTING UNDER THE COLOR OF FEDERAL
AUTHORITY
VIOLATION OF THE FIFTH AMENDMENT OF
THE CONSTITUTION IN RELAVANT PART:
"NO PERSON SHALL ,,, BE DEPRIVED OF LIFE,
LIBERTY, OR PROPERTY WITHOUT DUE PROCESS
OF LAW,,, WITHOUT JUST COMPENSATION"

(5)

VIOLATION OF THE FIFTH AND
FOURTHTEENTH AMENDMENTS OF THE
CONSTITUTION. CONTAIN DUE PROCESS
CLAUSES PROHIBITING THE DEPRIVATION
OF LIFE, LIBERTY, OR PROPERTY WITHOUT
DUE PROCESS OR LAW; NOR DENY ANY
PERSON WITHIN ITS JURISDICTION THE
EQUAL PROTECTION OF THE LAW.

VIOLATION OF FIRST AND FIFTH AMENDMENTS
GAYDEN HAS THE RIGHT TO EXPECT THAT
AS A HUMAN BEING GAYDEN WILL BE
TREATED RESPECTFULLY, IMPARTIALLY, AND
FAIRLY BY ALL RESPONDENTS. (28 CFR
SECTION 542.12 (2006),
PETITIONER MAINTAINS THAT THE ACTION
TAKEN BY THE RESPONDENTS DENIAL
OF GAYDEN'S COMPASSIONATE RELEASE/
REDUCTION IN SENTENCE, WITHOUT JUST
CAUSE CONSTITUTES UNFAIR TREATMENT
IN VIOLATION OF GAYDEN'S FIRST AND
FIFTH AMENDMENTS.

(6)

STATEMENT OF CASE

PRO SE RULING HELD TO A LESS STRINGENT ~~STANDARD~~ STANDARD,

THE STANDARD USED TO EVALUATE THE
SUFFICIENCY OF A PLEADING IS FLEXIBLE,
AND A PRO SE COMPLAINT, HOWEVER INARTFULLY
PLEADED, MUST BE HELD TO LESS STRINGENT
STANDARDS THAN FORMAL PLEADINGS DRAFTED
BIY LAWYERS." ERICKSON V. PARDUS, 551 U.S.
89, 94, (2007) AND HAINES V. KERNER, 404. U.S. 19,
30 L.Ed. 2d 652  5 Ct. 594, (1972).

FURTHER, THIS COURT IS REQUIRED TO HOLD A
"PRO SE" PLEADING TO A LESS STRINGENT STANDARD
THAN THOSE DRAFTED BY ATTORNEYS ( WALKER V.
TRUE, 399 F. 3d 315 (4TH CIT. 2005), AND MUST
LIBERALLY CONSTRUE COMPLAINTS FILED BY "PRO SE"
LITIGANTS, TO PERMIT THE DEVELOPMENT OF A
POTENTIALLY MERITORIOUS CASE, (HUGHES V. ROWE,
499 U.S. 5, 9 (1980).



<u>PROCEDURAL REQUIREMENTS HAVE BEEN MET.</u>

THE RESPONDENTS HAVE ALREADY ADMITTED THAT THE PROCEDURAL REQUIREMENTS OF THE STATUTE HAVE BEEN MET AND DECLINE TO ARGUE ANY CLAIM THAT THE BUREAU OF PRISONS ADMINISTRATIVE REMEDY PROGRAM HAS NOT BEEN EXHAUSTED PRIOR TO FILING THIS LAWSUIT. THE BUREAU OF PRISONS ADMINISTRATIVE REMEDY PROGRAM IS ONLY FOR INTERNAL BUREAU OF PRISON USE AND NOT FOR EXTERNAL COURT FILINGS, (EXHIBIT D). (GORDON V. LEEKE, 574 F. 2d 1147, 1151 (4TH CIR. 1978,,,) GAYDEN INSERTS THE "DECLARATION OF MALLORY STORUS" ATTORNEY FOR FCC BUTNER, N.C. TO OVERCOME THE STATEMENTS BY RESPONDENTS THAT ADMINISTRATIVE REMEDIES BP-8 THROUGH BP-11 MUST BE FINISHED PRIOR TO FILING ANY COMPLAINT(S) IN COURT. [PAGE 2 PAR.6]. MS. STORUS SWORN STATEMENT CONFIRMS: "A CLAIM MAY ALSO BE FILED WITHOUT A SF-95 FORM, IF THE CLAIMANT FILES/PROVIDES ALL OF THE NECESSARY INFORMATION."

(8)

## GAYDEN'S CLAIMS AGAINST RESPONDENTS ARE NOT FRIVOLOUS

GAYDEN'S CLAIMS AGAINST RESPONDENTS ARE NOT FRIVOLOUS AND SURVIVE INITIAL REVIEW. SEE BIVENS, 403 U.S. AT 395-97 [FINDING GAYDEN MUST PLAUSIBLY ALLEGE A FEDERAL ACTOR VIOLATED GAYDEN'S CONSTITUTIONAL RIGHTS]; SEE ALSO YOUNG V. CITY OF MOUNT RAINIER, 238 F. 3d 567, 575 (4TH CIR. 2001).

GAYDEN'S CIVIL BIVENS CLAIM FOR MONETARY DAMAGES MEET THE PRIMA FACIE STANDARD SUFFICIENT TO ESTABLISH THE FACTS IN THIS CASE OR TO RAISE THE PRESUMPTION OF PROOF SUFFICIENT TO ALLOW THE FACT-TRIER TO INFER THE FACTS AT ISSUE AND RULE IN GAYDEN'S FAVOR.

ANY ARGUMENTS RESPONDENTS MAY MAKE SERVE ONLY TO DELAY THE EFFECTIVE AND EXPEDITIOUS ADMINISTRATION OF THE BUSINESS OF THE COURT.

(9)

## STATEMENT OF CASE

RESPONDENTS FAILED TO TAKE REASONABLE MEASURES TO REDUCE THE RISK OF SERIOUS HARM TO GAYDEN BY UNLAWFUL VIOLATION OF ATTORNEY GENERAL MERRICK GARLAND'S FEDERAL LAW GRANTING GAYDEN COMPASSIONATE RELEASE / REDUCTION IN SENTENCE TO APPROPRIATE HOME CONFINEMENT, GARLAND'S NEW MANDATORY FEDERAL LAW ON 12-21-2021 GRANTED GAYDEN "EXTRAORDINARY AND COMPELLING REASONS" UNDER 18 U.S.C. SECTION 3582(C)(1)(A)(i) "OTHER REASONS," FOR COMPASSIONATE RELEASE / REDUCTION IN SENTENCE FOR APPROPRIATE PLACEMENT TO HOME CONFINEMENT. GARLAND ORDERED THAT GAYDEN, 68 YEARS OLD, WITH HIGH RISK FACTORS OF CONTRACTING COVID-19 BECAUSE OF VULNERABILITY TO SEVERE ILLNESS AND DEATH FROM (FTD) FRONTALTEMPORAL DEMENTIA (EXHIBIT B) AND HYPERTENSION, BOTH LISTED BY THE CDC (EXHIBIT C) ARE ALL THAT IS REQUIRED. GAYDEN'S LENGTH OF SENTENCE AND AMOUNT OF TIME SERVED NO LONGER PREVENTS GAYDEN FROM HOME CONFINEMENT. THE EXPANDED MODIFICATION OF THE CARES ACT PUB.L. NO 116-136 OF 12003(b)(4) AND DELETING 12003(a) STAT. 281, 516 IS BASED ON THE COVID-19 ETERNAL PANDEMIC AND AFTERWARD. THIS INTERVENING NEW FEDERAL LAW HAS SUBSTANTIAL CONTROLLING EFFECT. RESPONDENTS DELIBERATE INDIFFERENCE OR SIMPLY UNAWARENESS CONSTITUTES A VIOLATION OF THE EIGHTH CONSTITUTIONAL AMENDMENT HOLDING CRUEL AND UNUSUAL PUNISHMENT DUE TO PRISON CONDITIONS AND UNCONSTITUTIONAL CONFINEMENT WARRANTING MONEY DAMAGES.

(10)

STATEMENT OF CASE

GAYDEN HAS MET ALL REQUIREMENTS FOR
COMPASSIONATE RELEASE / REDUCTION IN SENTENCE
FOR APPROPRIATE MANDATORY HOME CONFINEMENT.

* GAYDEN, A FIRST TIME NONVIOLENT, 68 YEAR OLD
  OFFENDER QUALIFIES FOR CR/RIS TO APPROPRIATE
  HOME CONFINEMENT

* GAYDEN HAS NO HISTORY OF ILLEGAL DRUG USE
  AND QUALIFIES FOR CR/RIS TO APPROPRIATE HOME
  CONFINEMENT.

* GAYDEN, SCORED BY THE BOP/DOJ A "MINIMAL"
  RISK/RECIDIVISM TO THE SAFETY OF ANY OTHER
  PERSON OR TO THE COMMUNITY, QUALIFIES FOR
  CR/RIS TO APPROPRIATE HOME CONFINEMENT

* GAYDEN RESIDES AT FCC COLEMAN "LOW" CORRECTIONAL
  INSTITUTIONA, QUALIFYING FOR CR/RIS TO
  APPROPRIATE HOME CONFINEMENT

* GAYDEN, AN EXEMPLARY FEDERAL INMATE, QUALIFIES
  FOR CR/RIS TO APPROPRIATE HOME CONFINEMENT.

(11)

STATEMENT OF CASE

• GAYDEN QUALIFIES FOR CR/RIS TO APPROPRIATE HOME CONFINEMENT TO BE WITH GAYDEN'S WIFE, MELISSA MADDEN GAYDEN, AND GAYDEN'S EIGHT YEAR OLD SON AT 608 MANGO DRIVE, MELBOURNE BEACH, FL 32951.

• GAYDEN WILL HAVE MEDICARE HEALTH INSURANCE AND QUALIFIES FOR CR/RIS TO APPROPRIATE HOME CONFINEMENT

• GAYDEN WILL HAVE SOCIAL SECURITY RETIREMENT INCOME AND QUALIFIES FOR CR/RIS TO APPROPRIATE HOME CONFINEMENT

• GAYDEN WILL RECEIVE MEDICAL CARE AT HEALTH FIRST HOLMES REGIONAL MEDICAL CENTER, MELBOURNE, FL 32901, AND QUALIFIES FOR CR/RIS TO APPROPRIATE HOME CONFINEMENT

MONEY DAMAGES ARE WARRANTED FOR PRISON CONDITIONS OR UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT IN VIOLATION OF THE EIGHTH AMENDMENT TO THE CONSTITUTION; 28 U.S.C. SECTION 1331.

GAYDEN HAS SUFFERED IRREPARABLE HARM TO GAYDEN'S CONSTITUTIONAL RIGHTS AND HEALTH FROM GAYDEN'S UNCONSTITUTIONAL CONDITIONS OR CONFINEMENT

GAYDEN HAS A RIGHT TO RECOVER DAMAGES FOR CONSTITUTIONAL VIOLATIONS BY A FEDERAL AGENT UNDER BIVENS

UNDER BIVENS "VICTIMS OF A CONSTITUTIONAL VIOLATION BY A FEDERAL AGENT HAVE A RIGHT TO RECOVER DAMAGES AGAINST THE OFFICIAL IN FEDERAL COURT DESPITE THE ABSENCE OF ANY STATUTE CONFERRING SUCH RIGHT." CARLSON V. GREEN, 446 U.S. 14, 18 (1980) (CITING BIVENS, 403 U.S. AT 394 (1971). "THE PURPOSE OF BIVENS IS TO DETER INDIVIDUAL FEDERAL OFFICERS FROM COMMITTING CONSTITUTIONAL VIOLATIONS." (CORR. SERVS. CORP. V. MALESKO, 534 U.S. 61, 70 (2001).

(13)

QUALIFIED IMMUNITY FOR RESPONDENTS DOES NOT MAKE RESPONDENTS IMMUNE OFFICIALLY OR INDIVIDUALLY FROM CLAIMS OF DAMAGES WHEN RESPONDENTS KNOW THEY VIOLATE ESTABLISHED FEDERAL LAW BY "ACTIONS OR INACTIONS" AND DEPRIVE GAYDEN OF CONSTITUTIONAL RIGHTS.

RESPONDENTS DO NOT HAVE QUALIFIED IMMUNITY FOR "ACTIONS OR INACTIONS" REGARDING GAYDEN'S 68 YEARS OF AGE, DEMENTIA, AND HYPERTENSION, LISTED BY THE CDC AS CONDITIONS FOR VULNERABILITY TO SEVERE ILLNESS AND DEATH BY CONTRACTING COVID-19.

A CLAIM OF DENIAL OF ADEQUATE MEDICAL CARE, WHETHER LODGED UNDER THE EIGHTH AMENDMENT OR THE FOURTEENTH AMENDMENT REQUIRES A COURT TO ANALYZE THE SAME ISSUE: THE RECKLESS, DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED. IN ORDER TO STATE AN EIGHTH AMENDMENT CLAIM OF DENIAL OF MEDICAL CARE, GAYDEN DEMONSTRATES THAT THE RESPONDENTS ACTION OR FAILURE TO ACT AMOUNTED TO RECKLESS, DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED. (SEE ESTELLE V. GAMBLE, 429 U.S. AT 106 --- JACKSON V. LIGHTSEY, 775 3d. 170-178 (4TH CIR. 2014).
(A SERIOUS MEDICAL NEED IS ONE THAT'S DIAGNOSED BY A MEDICAL DOCTOR AS MANDATING TREATMENT OR ONE THAT'S SO OBVIOUS THAT EVEN A LAY PERSON WOULD EASILY RECOGNIZE THE NECESSITY FOR A DOCTOR'S ATTENTION ...).

(14)

(IKO V. SHREVE, 535 F.3d 225-241 (4TH CIR. 2008)
QUOTING HENDERSON V. SHEAHAN, 196 F.3d 839-846
(7TH CIR. 1999).

FARMER V. BRENNAN, 511 U.S. 825 (1994) IS THE
STANDARD FOR DETERMINING DELIBERATE
INDIFFERENCE TO GAYDEN'S HEALTH AND
SAFETY IN VIOLATION OF THE EIGHTH
CONSTITUTIONAL AMENDMENT CRUEL AND
UNUSUAL PUNISHMENT AND UNCONSTITUTIONAL
CONFINEMENT.

VIOLATION OF THE EIGHTH AMENDMENT
OF THE CONSTITUTION
CRUEL AND UNUSUAL PUNISHMENT;
UNCONSTITUTIONAL CONFINEMENT

● RESPONDENTS FAILED TO ADEQUATELY DIAGNOSE,
MONITOR, AND TREAT GAYDEN'S (FTD) FRONTAL-
TEMPORAL DEMENTIA BECAUSE OF COVID-19 AND
RECKLESS DELIBERATE IGNORANCE.
(CR/RIS GRANTED THOMAS KOHLER)
UNITED STATES V. KOHLER, 2022 U.S. DIST. LEXIS 45916
M.D. FLORIDA, MARCH 15, 2022.

● GAYDEN'S DEPRIVATION OF ALL MEDICAL CARE FOR
3½ YEARS FOR TREATMENT (FTD) FRONTAL-TEMPORAL
DEMENTIA.

(15)

● DEPRIVATION OF GAYDEN'S MEDICAL CARE AFTER
GAYDEN CONTRACTED COVID-19 IN 2020 WITH POLICIES
AND PROCEDURES OF "ACTIONS OR INACTIONS" AT FCC
BUTNER THAT ALMOST CAUSED GAYDEN'S DEATH AND
DID KILL 93 INMATES IN 2020, (SEE EXHIBITS)

● RESPONDENTS ARE FULLY AWARE OF HIGH RISK
CONDITIONS IN OPEN BAYS IN FEDERAL PRISONS.
(SEE EXHIBITS --- OIG REPORT.)

● RESPONDENTS KNOW THAT GAYDEN IS VULNERABLE
TO SEVERE ILLNESS AND DEATH DUE TO HIGH RISK
CONDITIONS OF AGE, DEMENTIA, AND HYPERTENSION.

● RESPONDENTS IGNORED ATTORNEY GENERAL BARR AND
GARLAND'S DIRECTIVE TO RELEASE HIGH RISK
ELDERLY INMATES WITH MEDICAL CONDITIONS LISTED
BY THE CDC TO APPROPRIATE HOME CONFINEMENT
VIOLATING FEDERAL LAW AND REFUSED TO MAKE THE
REQUIRED ADJUSTMENTS TO SAVE LIVES.,,,
● AND THUS ALLOWED MEN TO DIE ON PURPOSE IN
CONFINED QUARTERS.

● RESPONDENTS FAILURE TO ACT CAUSING ABOMINAL
DEATHS DUE TO HORRIFIC PRISON CONDITIONS ARE
GROSSLY IMMORAL, AND SHOCK THE AVERAGE LAY
PERSON'S CONCIOUSNESS WITH RESPONDENTS
INIQUITOUS ACTS.

(16)

● RESPONDENTS DO NOT PROVIDE HUMANE CONDITIONS
OF CONFINEMENT WITH RECKLESS, DELIBERATE
INDIFFERENCE TO THE HEALTH AND SAFETY OF GAYDEN.

● RESPONDENTS ADMIT TO KNOWING THE SUBSTANCIAL
HIGH RISK TO GAYDEN BECAUSE OF THE VERY
FACT THE HIGH RISK WAS OBVIOUS.

● RESPONDENTS DO NOT HAVE QUALIFIED IMMUNITY
WHEN THEY KNOW RESPONDENT "ACTIONS OR INACTION"
VIOLATE CONSTITUTIONAL LAW BY FRAUDULENTLY
REPORTING THE NUMBER OF COVID-19 DEATHS AND
INFECTIONS, (SEE EXHIBIT). FRAUD, LIES, PERJURY,
AND DECEIT NULLIFY QUALIFIED IMMUNITY AND
REQUIRE TRIPLE DAMAGES.

● RESPONDENTS IGNORED A CRITICAL MEDICAL NEED
OR N-95 MASKS WHICH ARE MEDICALLY APPROVED.
THE CURRENT, NOT MEDICALLY APPROVED, CLOTH
MASKS ARE NOT EFFECTIVE AGAINST COVID-19
AND CERTAINLY DO NOT WORK IN OPEN BAYS.

● RESPONDENTS FABRICATED DOCUMENTS THAT MODIFIED
"VITAL STATISTICS" RESPONDENTS FALSELY REPORTED
TO THE PUBLIC AND TESTIFIED BEFORE CONGRESS
UNDER OATH FULLY KNOWING RESPONDENTS REPORTS
ARE A PATTERN AND PRACTICE OF FRAUD AND DECEIT.
RESPONDENTS WORD CAN NOT BE TRUSTED.

GAYDEN'S UNCONSTITUTIONAL CONFINEMENT VIOLATES GAYDEN'S FIRST, FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH CONSTITUTIONAL AMENDMENT RIGHTS BY A FEDERAL OFFICIAL UNDER COLOR OF LAW. GAYDEN'S RIGHTS ARE GUARANTEED BY THE CONSTITUTION OF THE UNITED STATES, 1983 CIVIL RIGHTS VIOLATIONS AND CONSTITUTIONAL RIGHTS CLAIMS FALL UNDER BIVENS ACTION, THE MERITS MUST BE ADDRESSED TO PREVENT FURTHER MISCARRIAGE OF JUSTICE,

GAYDEN HAS PERMANENT DAMAGE FROM DEVELOPING THE LONG TERM HEALTH IMPACTS WITH WORSENING DEMENTIA AFTER CONTRACTING COVID-19 IN MARCH, 2020, UNITED STATES V. STEPHENS, 2022 U.S. DIST. LEXIS 30655 (D. MONTANA, FEB. 22, 2022, (CR/RIS GRANTED) SEE MAXINE TAQUET et. al., INCIDENCE, CO-OCCURRENCE, AND EVOLUTION OF LONG-COVID FEATURES: SIX MONTH RETROSPECTIVE COHORT STUDY OF 273,618 SURVIVORS OF COVID-19. (PLOS MEDICINE, SEPT. 2021),

TOXIC EXPOSURES ARE UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT.

IN 1993 UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT DUE TO TOXIC EXPOSURES WAS ESTABLISHED BY HELLING VIOLATING THE EIGHTH CONSTITUTIONAL AMENDMENT BY RADON HAVING A SUBSTANTIAL RISK OF HARM THAT SOCIETY IS

UNWILLING TO ACCEPT. FCC BUTNER AND FCC
COLEMAN IN A ZONE ONE (IRAA) INDOOR RADON
ABATEMENT ALL HAVING A RATING PREDICTED
GREATER THAN FOUR PICOCURIES PER LITER, THE
HIGHEST TOXIC RATING. RADON GAS, SIMILAR TO
COVID-19 PRESENTS AN OBJECTIVELY SUBSTANTIAL
RISK TO IMMEDIATE AND FUTURE HARM. GAYDEN
IS ENTITLED TO MONEY DAMAGES DUE TO THIS CLAIM,
(HELLING, (S.CT 1993), FCC BUTNER WAS BUILT ON
A TOXIC WASTE DUMP OF CARCINOGENS, AS WAS
PROBABLY COLEMAN. RADON IN THE AREA OF
BOTH PRISONS IS NATURALLY FOUND IN ROCK AND
NOT SUITABLE FOR ANY OTHER BUILDINGS OTHER
THAN PRISONS. IT IS HIGHLY LIKELY NO CARCINOGEN
TESTING INCLUDING RADON WAS EVER DONE AND
THEREFORE NO MITIGATION WAS EVER REQUIRED.


AIR VENTILATION SYSTEMS AT BUTNER / COLEMAN
HAVE UP TO 10 INCHES OF DUST, BLACK MOLD, DUST MITES,
AND HUMAN EPITHELIAL CELLS WITH PROBABLE
COVID-19 SURVIVING IN THE VENTILATION
SYSTEM JUST LIKE IT SURVIVES IN SEWAGE.
SO FAR INDEPENDENT LAB TESTING OF WATER AND
AIR IN OPEN BAY UNITS HAVE BEEN DENIED
BY RESPONDENTS, THEREFORE NO MITIGATION IS
REQUIRED. (SEE ENCLOSED EXHIBITS). RESPONDENTS
CONDITIONS OF CONFINEMENT ARE TOXIC
EXPOSURES TO UNCONDITIONAL CONDITIONS
OF CONFINEMENT HAVING A SUBSTANTIAL RISK
OF HARM THAT SOCIETY IS UNWILLING TO ACCEPT.

(19)

⚫ GAYDEN IS "CAPTIVE" AND HAS NO INDIVIDUAL
MEANS OF PROVIDING PROTECTION FOR HIMSELF
WITHIN THE EXTANT OF FCC COLEMAN LOW.
RESPONDENTS FAEL TO ACKNOWLEDGE WITH
UNAWARENESS OR DELIBERATE IGNORANCE ATTORNEY
GENERAL MERRICK GARLAND'S MANDATORY FEDERAL
LAW WITH INTERVENING AND SUBSTANCIAL CONTROLLING
EFFECT ON 12-21-2021 GRANTING GAYDEN COMPASSIONATE
RELEASE/REDUCTION IN SENTENCE FOR APPROPRIATE
PLACEMENT TO HOME CONFINEMENT.

⚫ THE SUPREME COURT HAS RECOGNIZED THAT THE
EIGHTH AMENDMENT "REQUIRES THAT INMATES BE
FURNISHED WITH THE BASIC HUMAN NEEDS, ONE OF
WHICH IS REASONABLE SAFETY." [AND IT IS] "CRUEL
AND UNUSUAL PUNISHMENT TO HOLD CONVICTED
CRIMINALS IN UNSAFE CONDITIONS, HELLING U.
MC KINNEY, 509 U.S. 25, 29, 113 S. Ct. 2475, 125 L
Ed. 2d. 22 (1993) Ld At 33,
GAYDEN SHOWS SUBSTANCIAL RISK OF EXPOSURE
TO COVID-19, WHICH IS INCONSISTENT WITH CONTEMPRARY
STANDARDS OF HUMAN DECENCY. SEE HELLING, 509
U.S. AT 32-35 (NOTING PRISON CONDITIONS WHERE
INMATES "IN PUNITIVE ISOLATION WERE CROWDED
INTO CELLS AND SOME OF THEM HAD INFECTIOUS
MALADIES SUCH AS HEPATITIS AND VENERAL
DISEASE ... WAS ONE OF THE PRISON CONDITIONS
FOR WHICH THE EIGHTH AMENDMENT REQUIRED
A REMEDY." PRISON IS MEANT TO BE REHABILATATING
NOT CAUSE DEATH FROM COVID-19,

(20)

- IT IS ALWAYS IN THE PUBLIC INTEREST TO PREVENT THE VIOLATION OF A PARTY'S CONSTITUTIONAL RIGHTS. WILSON V. WILLIAMS, 961 F. 3d 829 2020 WL 3056217 AT 11.
  "THERE IS NO HARM TO THE GOVERNMENT WHEN A COURT PREVENTS THE GOVERNMENT FROM ENGAGING IN UNLAWFULL PRACTICES."

- GAYDEN CHALLENGES THE DURATION OF GAYDEN'S CONFINEMENT ON THE BASIS THAT NO SET OF CONDITIONS OF CONFINEMENT UNDER THE ETERNALLY LASTING COVID-19 PANDEMIC COULD BE COULD BE CONSTITUTIONAL AND VIOLATES THE U.S. CONSTITUTION, LAWS, AND TREATIES OF THE UNITED STATES.

- NO SET OF CONDITIONS WOULD BE SUFFICIENT TO PROTECT GAYDEN'S CONSTITUTIONAL RIGHTS. GAYDEN'S CLAIM ALSO CHALLENGES THE FACT, NOT CONDITIONS, OF GAYDEN'S CONFINEMENT. GAYDEN CLAIMS "NO MATTER WHAT STEPS ARE TAKEN, DUE TO GAYDEN'S UNDERLYING SERIOUS HEALTH CONDITIONS, THERE IS NO COMMUNAL HOLDING FACILITY WHERE GAYDEN COULD BE INCARCERATED DURING THE ETERNALLY LASTING COVID-19 PANDEMIC THAT WOULD BE CONSTITUTIONAL. GAYDEN'S CLAIM MUST ALSO BE CONSIDERED AS A CHALLENGE TO THE FACT OF CONTINUED VALIDITY OF GAYDEN'S CONFINEMENT

(21)

RESPONDENTS DO NOT DISPUTE THEY ARE AWARE OF THE RISK OF SPREAD OF THE ETERNALLY LASTING COVID-19 PANDEMIC. RESPONDENTS FAILURE TO GRANT COMPASSIONATE RELEASE/REDUCTION IN SENTENCE AGAINST INTERVENING FEDERAL LAW OF SUBSTANTIAL CONTROLLING EFFECT, TO GAYDEN AT AGE 68. WITH MEDICAL CONDITIONS LISTED BY THE CDC, FURTHER DEMONSTRATES DELIBERATE INDIFFERENCE TO GAYDEN'S VULNERABILITY TO SEVERE ILLNESS AND DEATH. RESPONDENTS PRISON CONDITIONS OF UNCONSTITUTIONAL CONFINEMENT IGNORE GAYDEN'S WORSENING DEMENTIA FROM CONTRACTING COVID-19 IN 2020 IN VIOLATION OF THE EIGHTH CONSTITUTIONAL AMENDMENT AND WARRANT MONEY DAMAGES FOR CRUEL AND UNUSUAL PUNISHMENT.


GAYDEN REQUESTS PUNITIVE DAMAGES OF $1,000 PER HOUR EQUAL TO $24,000 DOLLARS PER DAY FOR EVERY DAY IN PRISON SINCE ATTORNEY GENERAL MERRICK GARLAND'S ORDER ON 12-21-2021.

(22)

DECLARATION UNDER PENALTY OF PERJURY


I DECLARE UNDER PENALTY OF PERJURY
I HAVE READ THIS PETITION AND THE INFORMATION
IN THIS PETITION IS TRUE AND CORRECT TO THE BEST
OF MY BELIEF. I UNDERSTAND THAT A FALSE
STATEMENT OF MATERIAL FACT MAY SERVE AS
A BASIS FOR PROSECUTION OF PERJURY.

DATE: MARCH 23, 2022          John Matthew Gayden, Jr., M.D.
       #67742-018            JOHN MATTHEW GAYDEN, Jr.M.D.
                             FCC COLEMAN LOW, B-1
                             P.O. BOX 1031
                             COLEMAN, FL 33521-1031

EXHIBIT A      OIG REPORT

EXHIBIT B      DEMENTIA— PETSCAN, NEUROCOGNITIVE TESTS

EXHIBIT C      DEMENTIA LISTED BY CDC.

EXHIBIT D,     BOP DENTALS.

EXHIBIT E      DECLARATION OF DR. JOE GOLDENSON, M.D.

EXHIBIT F      93 DEATHS IN 2020 / VIOLATIONS 8TH AMENDMENT.

EXHIBITS G     RADON / CARCINOGENS / TOXINS IN AIR AND WATER

EXHIBIT H      ATTORNEY GENERAL MERRICK GARLAND 12-21-2022



■ An official website of the United States government  Here's how you know



**U.S. Department of Justice Office of the Inspector General**

MENU

# DOJ OIG Releases Reports of Remote Inspections of FCC Butner and FCI Milan Examining the Institutions' Response to the Coronavirus Pandemic

Department of Justice (DOJ) Inspector General Michael E. Horowitz announced today the release of the thirteenth and fourteenth reports in a series of remote inspections the Office of the Inspector General (OIG) has been conducting of Federal Bureau of Prisons (BOP) facilities since April 2020. The reports released today concern Federal Correctional Complex (FCC) Butner, located in Granville and Durham Counties, North Carolina, and Federal Correctional Institution (FCI) Milan, located in Washtenaw County, Michigan.

The OIG's findings for FCC Butner included the following:

- COVID-19 Cases: At FCC Butner, the most serious coronavirus disease 2019 (COVID-19) outbreak occurred between June and mid-July 2020. As of July 25, 1,020 FCC Butner inmates and 70 staff members had tested positive for COVID-19 and 25 inmates and 1 staff member had died. After July, the number of cases began to diminish; however, in October and November, Butner began seeing new cases. As of January 17, 2021, 226 inmates had active COVID-19 cases and 2 additional inmates had died as a result of COVID-19. Also as of January 17, 23 staff members had active COVID-19 cases.
- Staffing Challenges: Although FCC Butner took steps to limit staff movement throughout its individual institutions in order to reduce the spread of COVID-19, it was not able to fully restrict staff movement in two of its four institutions and thus could not completely mitigate the risk of cross-contamination and spread of COVID-19 in these institutions.
- Social Distancing: It was difficult for Butner to implement and enforce effective social distancing measures in three of its five facilities given the open-bay layout of housing units in these facilities.
- Personal Protective Equipment: While FCC Butner did have sufficient supplies of personal protective equipment (PPE), some staff did not change N95 respirators when moving between housing units that had COVID-19 positive inmates and units that did not, which may have increased the risk of cross-contamination.
- Quarantine Issues: As COVID-19 spread throughout two of the complex's institutions, these institutions were not able to quarantine all inmates meeting the criteria for quarantine, largely due to a shortage of space.

The OIG's findings for FCI Milan included the following:

- COVID-19 Cases: FCI Milan experienced an influx of staff and inmate COVID-19 positive test results during the first 2 weeks of April 2020. As of June 30, 98 inmates and 57 staff members had tested positive for COVID-19 and 3 inmates had died. FCI Milan saw a new wave of COVID-19 cases in December 2020 and, as of January 17, 2021, 35 inmates and 16 staff members had active COVID-19 cases.
- Staffing Challenges: The depletion of medical staff was the most significant and dangerous challenge to FCI Milan's COVID-19 response. By early May 2020, 75 percent of Milan's medical staff had contracted COVID-19, creating serious staffing shortages in Milan's Health Services Department. Additionally, staffing shortages generally due to the COVID-19 outbreak were a consistent challenge for Milan and made it difficult for the institution to restrict staff movement within the institution to prevent the spread of the virus.
- Social Distancing: The open-bay layout of certain housing units at FCI Milan posed significant challenges to achieving social distancing among inmates.

- Personal Protective Equipment: FCI Milan complied with the Centers for Disease Control and Prevention's (CDC) April 3, 2020 guidance recommending that face coverings be worn in public settings. Milan made surgical masks available to staff on April 4 and distributed surgical masks to all inmates between April 4 and April 6. However, by the time the CDC issued its guidance, COVID-19 was already spreading throughout the institution.
- Basic Prisoner Transportation at FCI Milan: By early April, Milan's Basic Prisoner Transportation (BPT) staff escorted at least one, and possibly more, inmates with COVID-19 symptoms to the local hospital without wearing appropriate PPE because Milan's correctional and Health Services staff did not recognize certain symptoms as potentially being COVID-19 related. We believe that the failure of Milan to provide PPE to BPT staff in these circumstances potentially increased those staff members' risk of contracting COVID-19 and potentially contributed to the spread of COVID-19 at Milan. According to a Milan official, 24 BPT staff subsequently contracted COVID-19 and were placed on sick leave by mid- to late April.

We also found that while the BOP had to make difficult, risk-based, decisions regarding inmate transfer to home confinement in response to the COVID-19 pandemic, the BOP did not fully leverage its existing or expanded authorities under the Coronavirus, Aid, Relief, and Economic Security Act and the Attorney General's guidance to promptly transfer FCC Butner and FCI Milan inmates to home confinement.

Today's reports do not include recommendations. Rather, our inspection reports are intended to assist the BOP and DOJ in identifying strategies to most effectively contain current and future COVID-19 outbreaks. Additional reports of the OIG's remote inspections will be released as they are completed. The DOJ OIG also plans to prepare a capstone report providing BOP-wide conclusions and recommendations resulting from our inspections.

Background: In April 2020, the OIG initiated a total of 16 remote inspections of selected BOP-managed institutions; contract prisons; and Residential Reentry Centers (RRC), sometimes referred to as halfway houses, to examine whether their response to the COVID-19 pandemic was in compliance with DOJ and BOP policy and pandemic-related guidance issued by the CDC.

Our inspections have been conducted through telephonic interviews; review of BOP documents and complaints we received; our analysis of data from the respective institutions; and the results of a survey we issued to employees of the BOP, contract prisons, and RRCs. The OIG conducted these inspections remotely because of CDC guidelines and DOJ policy on social distancing.

| Published Date | January 28, 2021 |
| --- | --- |
| Type | Press Release |
| PDF Press Release | 2021-01-28.pdf |
| Report | Remote Inspection of Federal Correctional Institution Milan<br>Remote Inspection of Federal Correctional Complex Butner |

**Oversight Work**

Reports

Criminal and Civil Cases

Misconduct Findings

Ongoing Work

**About**

About the Office

Meet the Inspector General

Contracting Opportunities

Careers

EXHIBIT #(B)



# SAND LAKE IMAGING
## A Tradition of Trust

9350 Turkey Lake Road, Orlando, FL 32819

Phone: (407) 363-2772        Fax: (407) 447-9966

To:   ROBERT COHEN PSYD
      32 W GORE
      5TH FLOOR
      ORLANDO, FL 32806

**Name:** GAYDEN, JOHN
**MRN #:** 10113776
**Account:** 010113776
**Accession:** 1697497
**DOB:** Jul 19, 1953    **Gender:** M
**Exam Date:** May 22, 2018
**Referring Phys.:** ROBERT COHEN PSYD

**Fax Number:** 321/843-6836

******** **ADDENDUM #1** ********

ADDENDUM:

Correction to paragraph under findings, the next to the last sentence should
read: No OTHER areas of hypometabolism are present.

Electronically signed by: Stephen Bravo M.D. 6/8/2018 1:58 PM

******** ORIGINAL REPORT ********

LIMITED F-18 FDG PET/CT BRAIN SCAN:

**CLINICAL HISTORY:** Impaired judgment. Memory loss/dementia.

**COMPARISON:** None.

**PROCEDURE:** Following a 4 hour fast, the patient was injected with 4.86 mCi of
F18-fluorodeoxyglucose (FDG) intravenously. 45 minutes later, high-resolution
positron emission tomographic (PET) imaging was performed, using a PET/CT
system, extending from the top of the skull to the base of the skull. CT
attenuation correction was employed. Images were reconstructed using 3D RAMLA
techniques. Images were formatted in the axial, coronal, and sagittal planes.
Attenuation corrected images, uncorrected, and cinematic projections were
displayed for review. Blood glucose prior to injection: 104 mg/dl. This study
is performed on a Siemens Biograph 64 slice PET/CT scanner.

**FINDINGS:** The PET demonstrates heterogeneous radioisotope hypometabolism
involving the frontal, parietal, occipital and temporal cortices. Predominance
to the hypometabolism involving the mesial temporal lobes, temporal lobes and
parietal lobes is noted. Normal gray-white interface is present. No areas of
hypometabolism are present. Normal cerebellar hemispheric metabolism is
identified.

Page 1 of 2                    Create Date: 2018-5-22

Patient: GAYDEN, JOHN    MRNO: 10113776    DOB: 07/19/1953    —    Continued
Quantitative analysis confirms global hypometabolism with more pronounced
hypometabolism involving the mesial temporal, temporal and parietal lobes.
Frontal lobe metabolism measures up to 0.4 standard deviations below the
reference population mean. These yield temporal lobe metabolism measures up to
1.0 standard deviations below the reference population mean. Temporal lobe
metabolism measures up to 1.1 standard deviations below the reference
population mean. Precuneus deposition measures at the reference population
mean. Parietal lobe metabolism measures up to 1.0 standard deviations below
the reference population mean. Occipital lobe metabolism measures up to 0.7
standard deviations below the reference population mean.

The CT correlate demonstrates age-appropriate gray-white differentiation and
ventricular size. No intraparenchymal hemorrhage or vasogenic edema is
present. There is no extraaxial fluid collection. Nor is there evidence for
intraparenchymal or extraaxial mass lesion. Bone windows demonstrate expanded
and clear visualized paranasal sinuses and mastoid air cells. There is no
fracture.

IMPRESSION:

1. Global hypometabolism. Hypometabolism most prominently involves the
temporal, mesial temporal and parietal lobes. This pattern of distribution can
be associated with Alzheimer's type dementia.

2. Unremarkable CT brain correlate.

3. These results were faxed to Dr. Cohen.

Electronically signed by: Stephen Bravo M.D. 5/25/2018 8:26 AM

Electronically signed by Stephen M. Bravo, M.D. 06/08/2018 14:03:18

type of FTD follows a pattern with symptoms seen in the mild stage becoming more pronounced and disabling over the course of 8 to 10 years. In the early years, a person with behavioral variant FTD tends to show marked behavioral changes, apathy and impaired judgment. After several years behavioral, and cognitive changes become more pronounced and an MRI or PET scan may show positive findings. End-stage disease includes profound functional impairment with possible language, motor and or memory difficulty.'

**DIAGNOSTIC IMPRESSIONS:**

1) Behavioral Variant, Frontotemporal Dementia (bvFTD), of mild to moderate severity (based on function and neurocognitive test scores).

I, Dr. Cohen, being duly licensed in the State of Florida, hereby affirm under the penalty of perjury that the information contained within this document was prepared and is the product of the undersigned, and it is true to the best of my knowledge and information based on what was provided and obtained from testing. If additional information is provided to me on this client, I reserve the right to integrate this information into my clinical opinion and update as necessary.

Respectfully Yours,

Robert E. Cohen, PsyD, ABPP
Clinical Neuropsychology
Board Certified in Rehabilitation Psychology
Licensed Psychologist, FL#PY7151
Neurocognitive Consultants of Orlando, LLC

1. A Healthcare Provider's Guide to Behavioral Variant Frontotemporal Dementia (bvFTD): Diagnosis, non-pharmacologic management, and other considerations. – UCSF Weill Institute for Neurosciences – Memory and Aging (pgs 1-25).

(EXHIBIT C)

 Centers for Disease
Control and Prevention



## COVID-19

# Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Providers

Updated Oct. 14, 2021

For the general public, see People with Certain Medical Conditions for an overview of medical conditions and resources. For information on the evidence used to update the list of underlying medical conditions, see the Science Brief.

## Purpose

An updated list of high-risk underlying conditions, based on what has been reported in the literature as of August 31, 2021 is provided below. The conditions are grouped by the level of evidence, with the highest level at the top. The list of underlying medical conditions is not exhaustive and will be updated as the science evolves. CDC is currently reviewing additional underlying conditions, and some of these might have sufficient evidence to be added to the list. This list should not be used to exclude people with underlying conditions from recommended preventive measures such as booster doses of vaccines or needed therapies. The process and evidence used to update the list is found in the brief of Scientific Evidence for Conditions that Increase Risk of Severe Illness.

This webpage provides an **evidence-based resource for healthcare providers** caring for patients with underlying medical conditions who are at higher risk of developing severe outcomes of COVID-19. Severe outcomes are defined as hospitalization, admission to the intensive care unit (ICU), intubation or mechanical ventilation, or death.

This page summarizes data from published reports, scientific articles in press, unreviewed pre-prints, and internal data that were included in a literature review conducted by subject matter experts as of August 31, 2021. The information reflects current evidence regarding underlying medical conditions and is intended to help healthcare providers make informed decisions about patient care and increasing the awareness of risk among their patients.

## Background

We continue to learn more about the risk factors for severe COVID-19 outcomes. Age is the strongest risk factor for severe COVID-19 outcomes. Approximately 54.1 million people aged 65 years or older reside in the United States; in 2020 this age group accounted for 81% of U.S. COVID-19 related deaths, and as of September 2021 the mortality rate in this group was more than 80 times the rate of those aged 18-29.[1, 2] In 2020, residents of long-term care facilities made up less than 1% of the U.S. population but accounted for more than 35% of all COVID-19 deaths.[3-7] Additionally, adults of any age with certain underlying medical conditions are at increased risk for severe illness from COVID-19.[8]

Studies have shown that COVID-19 does not affect all population groups equally. The risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person.[9-11] People with disabilities are more likely than people without disabilities to have chronic health conditions, live in congregate settings, and face more barriers to healthcare.[12-14] Studies have shown that some people with certain disabilities are more likely to get COVID-19 and have worse outcomes.[15-17] Some chronic medical conditions occur more frequently or at a younger age in certain racial or ethnic minority populations. Moreover, data has also shown that compared to non-Hispanic White people, members of certain racial and ethnic minority groups are dying from COVID-19 at younger ages.[18] Based on mortality data from CDC's National Vital Statistics System



(NVSS), from February 1, 2020 to September 30, 2021, there have been an estimated 700,000 excess deaths in the United States. The largest percentage increases in mortality occurred among adults aged 25–44 years and among Hispanic or Latino people.[19]

Additionally, we are still learning about how conditions that affect the environments where people live, learn, and work can influence the risk for infection and severe COVID-19 outcomes. These social determinants of health include neighborhood and physical environment, housing, occupation, education, food security, access to healthcare, and economic stability.

# Summary of Conditions with Evidence

1. Comorbidities that are supported by at least one **meta-analysis or systematic review** or by review method defined in Scientific Evidence brief.

- Cancer
- Cerebrovascular disease
- Chronic kidney disease*
- Chronic lung diseases limited to:
    - Interstitial lung disease
    - Pulmonary embolism
    - Pulmonary hypertension
    - Bronchopulmonary dysplasia
    - Bronchiectasis
    - COPD (chronic obstructive pulmonary disease)
- Chronic liver diseases limited to:
    - Cirrhosis
    - Non-alcoholic fatty liver disease
    - Alcoholic liver disease
    - Autoimmune hepatitis
- Diabetes mellitus, type 1 and type 2*
- Heart conditions (such as heart failure, coronary artery disease, or cardiomyopathies)
- Mental health disorders limited to:
    - Mood disorders, including depression
    - Schizophrenia spectrum disorders
- Obesity (BMI ≥30 kg/m²)*
- Pregnancy and recent pregnancy
- Smoking, current and former
- Tuberculosis

2. Comorbidities that are supported by at least one **observational study** (e.g., cohort, case-control, or cross-sectional):

These studies might include systematic review or meta-analysis that represents one condition in a larger group of conditions (for example, kidney transplant under the category of solid organ or blood stem cell transplantation).

- Children with certain underlying conditions
- Down syndrome
- HIV (human immunodeficiency virus)
- Neurologic conditions, including dementia
- Overweight (BMI ≥25 kg/m², but <30 kg/m²)
- Sickle cell disease



- Solid organ or blood stem cell transplantation
- Substance use disorders
- Use of corticosteroids or other immunosuppressive medications

3. Comorbidities that are supported by mostly **case series, case reports, or, if other study design, the sample size is small** (and no systematic review or meta-analysis available was available to review):

Defined as having an association in one or more case series studies. If there are cohort or case-control studies, the sample size was small. Conditions included might be less common.

- Cystic fibrosis
- Thalassemia

4. Comorbidities that are supported by **mixed evidence**:

Defined as having an association in at least one meta-analysis or systematic review and additional studies or reviews that reached different conclusions about risk associated with a medical condition.

- Asthma
- Hypertension, possibly*
- Immune deficiencies (except people with moderate to severe immune compromise due to a medical condition or receipt of immunosuppressive medications or treatments)

Footnote:

* indicates underlying conditions for which there is evidence for pregnant and non-pregnant people

# Actions Providers Can Take

- Approved and authorized COVID-19 vaccines (initial doses and boosters) are safe and effective and should be administered to people at higher risk including people with some underlying medical conditions. Reassure patients that clinical trials demonstrated similar safety and efficacy profiles in people with some underlying medical conditions, including those that place them at higher risk for severe COVID-19 symptoms, compared to people without underlying medical conditions.
- Check out additional information for your patients, including a link to your state or territorial health department's website on eligibility for and locations for COVID-19 vaccination.
- Encourage patients to keep appointments for routine care and adhere to treatment regimens.
- Consider use of telehealth in coordination with community-based organizations, family members, or other providers, when appropriate, although some patients may not have knowledge of or access to appropriate technology or internet service.
- Encourage patients with underlying medical conditions to continue practicing preventive measures, such as wearing a mask and physical distancing, to avoid infection with the virus that causes COVID-19. This becomes even more important with increasing age and number and severity of underlying conditions.
- Carefully consider potential additional risks of COVID-19 illness for patients who are members of certain racial and ethnic minority groups, and how to facilitate access to culturally and linguistically appropriate resources. These patients are often younger when they develop chronic medical conditions, might be at higher risk of having more than one underlying medical condition, and at higher risk for acquisition of COVID-19. Studies have shown that people in certain ethnic and racial minority groups are dying from COVID-19 at younger ages.

*EXHIBIT D*



**U.S. Department of Justice**
Federal Bureau of Prisons

---

*Low Security Correctional Institution*                     *Butner, North Carolina*

January 27, 2022

REPLY TO
ATTN OF:   M. L. King, Warden
            LSCI Butner

TO:         Gayden, John
            Register No.: 67742-018
            Vance A

SUBJECT:   Reduction in Sentence-Request

This memorandum is in response to your correspondence dated January 11, 2022, in which you requested a reduction in sentence (RIS) under Elderly with Medical Conditions. After careful consideration, your request is denied.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons.  BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner. Your request has been evaluated consistent with this general guidance. It has been determined that you do not meet the time-served criteria under elderly with medical conditions. At this time, you have not completed 50% or more of your current sentence as outlined in the program statement, you have currently completed 18.5 percent of your sentence.

Guidance regarding RIS criteria and requests for early home confinement are posted in the housing units, on TRULINCS and attached to this response.  In addition, guidelines regarding eligibility for early home confinement in response to the COVID-19 pandemic is attached for your records.



(EXHIBIT E)

## DECLARATION OF DR. JOE GOLDENSON, M.D.

I, Joe Goldenson, declare as follows:

1. I am a physician who has worked in health care for prisoners for 33 years. I worked for Jail Health Services of the San Francisco Department of Public Health for 28 years. I was the Director and Medical Director for 22 of those years. In that role, I provided clinical services, managed public health activities in the San Francisco County jail, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2. I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association.

3. I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco for 35 years.

4. I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5. My resume is attached as Exhibit A.

### COVID-19

6. COVID-19 is a disease that has reached pandemic status. As of May 14, 2020, according to the World Health Organization, more than four million people have been diagnosed with COVID-19 around the world and more than 290,000 people have died. [1] In the United States, over 1.3 million people have been diagnosed and over 82,000 people have died thus far.

7. COVID-19 is a serious illness caused by SARS-CoV-2, a novel coronavirus ("the virus"). In severe cases, COVID-19 can require hospitalization and lead to

---

[1] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report-115, May 14, 2020, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200511-covid-19-sitrep-112.pdf?sfvrsn=813f2669_2

respiratory failure and death. Symptoms may appear two to 14 days after exposure to the virus and may include fever, cough, and shortness of breath or difficulty breathing. While more than 80% of cases are mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

8.      Patients who suffer from serious disease may progress to Acute Respiratory Distress Syndrome (ARDS), which is a type of respiratory failure. Many patients suffering ARDS will require mechanical ventilation. ARDS has a 30% mortality rate overall, and a higher mortality rate in people with other medical conditions.

9.      Certain populations are particularly vulnerable to severe cases of COVID-19. The case fatality rate and need for advanced medical intervention and support increase significantly with advancing age in people aged over 50 and for people of any age with certain underlying medical conditions (the "medically vulnerable"). The Centers for Disease Control and Prevention ("CDC") identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals regardless of age, including: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and severe obesity.

10.     At this time, there is no vaccine to prevent COVID-19 and there is no known cure or anti-viral treatment available.

11.     The virus that causes COVID-19 is highly infectious. It is transmitted from person to person via airborne droplets. The droplets are released by infected individuals when they cough, sneeze or talk and can infect other persons in close proximity (within approximately six feet). The infected droplets can survive in the air for up to three hours. The virus may also be transmitted when a person touches a surface or object that has the virus on it and then touches their own mouth, nose, or possibly eyes. Infected droplets can survive on surfaces for varying time periods. For example, studies suggest that the virus can survive for up to 24 hours on cardboard, and for two to three days on plastic or stainless steel.

12.     A significant number of those who are infected with COVID-19 do not exhibit any symptoms. Similarly, some people may only experience mild symptoms. However, these asymptomatic and mildly symptomatic individuals can, and do, transmit the virus to others, which has further contributed to its rapid spread. Recognizing the high risk of transmission posed by asymptomatic individuals, CDC recommended everyone in the United States wear cloth face coverings when in public settings where social distancing is difficult to maintain.[2]

13.     The only known ways to reduce the risk of transmission of the spread of COVID-19 are maintaining six feet of physical distance between individuals ("social

---

[2] CDC, Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

2.

distancing"); wearing masks in public areas; frequent and thorough handwashing; cleaning and disinfection of surfaces and objects that are frequently touched, especially in common areas (i.e., objects/surfaces not ordinarily cleaned daily such as doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones) at least several times per day; adequate procedures and practices for isolation and quarantine; widespread testing to identify asymptomatic or presymptomatic individuals; and contact tracing of confirmed and suspect cases.

### The Risks of COVID-19 in Detention Facilities

14.   COVID-19 poses a very serious risk to detainees, staff and other visitors to detention facilities such as prisons or jails. It is uncontroversial that detention facilities, including prisons like FCC Butner, are associated with high transmission rates for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

15.   Living conditions in prisons and jails exacerbate the spread of infectious diseases, particularly diseases like COVID-19 that are transmitted by airborne droplets. In these facilities, large numbers of people are closely confined and are physically unable to practice social distancing, which the CDC has identified as a key method reducing transmission of respiratory diseases such as COVID-19[3] Further, detainees often have limited access to hygiene and personal protective equipment such as soap, hand sanitizer, masks and gloves.

16.   People in jails and prisons typically sleep in close quarters, for example a single room may contain multiple bunkbeds with limited ventilation. A single cell can house multiple people. Detainees are generally forced to share toilets, sinks and showers without disinfection between use. Common areas are shared by large groups of people. The preparation and distribution of food is often centralized, sometimes using a single kitchen or cafeteria for an entire facility.

17.   Additionally, the likelihood of exposure is heightened due to the constant "churn" (i.e., exit and entry) of both staff and detainees in jails, and population mixing of staff and detainees. Staff have regular direct physical contact with detainees, for example when handcuffing or removing handcuffs from detainees who are entering or exiting the facility.

18.   These factors led to outbreaks of COVID-19 in multiple detention facilities in China, where the virus was introduced into facilities by staff. Notably, in the first

---

[3] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

days of the COVID-19 outbreak at Rikers Island detention facility in New York City, the majority of cases were among prison staff, not detainees.

19.    Jails and prisons generally lack the medical care infrastructure and resources required to cope with an outbreak of infectious disease. Some do not have onsite medical facilities at all. Medical facilities within jails and prisons are generally designed and resourced to administer medical care for the ordinary day to day needs of detainees. They are not designed or equipped to cope with an influx of cases of a highly infectious disease like COVID-19, especially in addition to the regular case load. Medical facilities within detention facilities are generally not designed or equipped to administer the resource-intensive advanced care required by patients with serious cases of COVID-19.

20.    Jails and prisons often need to rely on external facilities such as hospitals and emergency departments to provide intensive medical care. This places additional strain on the resources of those facilities which may already be overwhelmed during a pandemic.

21.    During an outbreak, prison staff also become infected, fall ill and therefore cannot report to work. This can result in understaffing of crucial roles, such as medical staff, cleaning staff and security staff, placing further strain on the facility's ability to cope with the outbreak. This will not only result in a decreased ability to adequately address the health and public health issues related to COVID-19, but will also impact the care of patients with acute and chronic problems not related to the current pandemic.

22.    Prison outbreaks can pose serious risks to communities beyond the prison. For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region.

23.    Medically vulnerable people within jails and prisons are at even higher risk than other detainees. As described herein, compared to the general population, they are at a higher risk of death or severe illness from COVID-19. They also require ongoing medical care for their underlying medical conditions. However, medical units within detention facilities may not have the resources to administer adequate care during the course of a pandemic. Failure to provide those individuals with adequate medical care for chronic underlying health conditions will also result in increased risk of morbidity and mortality related to those underlying conditions. In turn, that results in increased risk of COVID-19 infection and increased risk of COVID-19-related morbidity and mortality if they do become infected.

24.    While jails and prisons should take all measures possible to reduce exposure to infection in detention, given the rapid spread of COVID-19 it is now likely impossible to achieve and sustain those measures quickly enough to mitigate the

4

risk of transmission. It is therefore an urgent priority to reduce the number of persons in detention as quickly as possible.

25. This is consistent with guidance from the World Health Organization, which recommended that "enhanced consideration should be given to resorting to non-custodial measures at all stages of the administration of criminal justice, including at the pre-trial, trial and sentencing as well as post-sentencing stages." Indeed, the pandemic has prompted the release of prisoners around the world. In California, 3,500 inmates were granted early release. France released 5,000 inmates. Many cities and counties across the US, including San Francisco, Chicago, Cleveland and New York, are also releasing prisoners to reduce the risk of COVID-19.

<u>Medically Vulnerable Persons at FCC Butner Are At Grave Risk of Death or Serious Illness</u>

26. I have reviewed the following materials regarding the conditions at FCC Butner. Declarations of Charles Hallinan, John Dailey, Lewis Huntley, Arnold Hill, Josean Kinard, Benjamin McCrae, Lee Ayers, George Riddick, Jorge Maldonado, Roger Goodwin, Randy Ortiz, Matthew Harrigan, Troy Titus, William Whyte, Antwan Harris, and John Krokos. My understanding of conditions at FCC Butner comes from these declarations, unless otherwise noted.

27. Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the materials above, it is my opinion that medically vulnerable persons at FCC Butner are at grave risk of death or serious illness. To reduce that risk, the persons at FCC Butner who are medically vulnerable should be removed, to the extent possible, from FCC Butner. For any people who remain incarcerated at FCC Butner, the facility must make changes to enable effective social distancing, frequent and thorough handwashing, and frequent cleaning and decontamination of surfaces/objects, as well as the other prevention activities noted above in paragraph 13. The reasons for this conclusion are described below.

28. My understanding from Plaintiffs' Counsel is that FCC Butner is complex of four prisons, including (1) a medium security facility that has a population of 671 and an adjacent minimum security satellite camp of more than 200 prisoners; (2) a second medium security facility with a population of almost 1,500 prisoners; (3) a low security facility that houses over 1,200 prisoners, many of whom have chronic medical conditions; and (4) a Federal Medical Center housing over 900 people, more than 500 of whom are there for treatment of serious medical or mental health conditions.

29. I understand that many incarcerated people at FCC Butner are housed in large open dormitories housing between 70 and 162 people in cubicles that have partial walls. I understand that some housing units contain as many as 120 people living in multiple-person cells, and some contain rows of bunkbeds in hallways. I

5

understand that in all locations other than the Federal Medical Center and FCI Butner II, most of the people in the housing units must share a relatively small number of toilets, sinks, and showers, and must stand in line multiple times a day to receive medications and meals. I understand that in all locations other than the Federal Medical Center at Butner, people must share shower facilities and other common areas. I understand that in all locations other than the Federal Medical Center people must share phones and computers and are in close proximity to each other when they are using them and when they are waiting for them.

30. Plaintiffs' counsel has informed me that BOP reports that there have been 318 confirmed cases of COVID-19 at FCC Butner and that eight people have died of COVID-19 there. Plaintiffs' counsel has informed me that BOP reports that there have been only about 459 tests for COVID-19 done for the 4,550 people incarcerated at FCC Butner, and that BOP is not testing staff. From the declarations, I understand that most of the people incarcerated at FCC Butner have not been tested for the virus. I understand that people are placed in isolation only if they have a temperature, and that at different times during this outbreak, people could have their temperature taken only if they signed up for sick call. Failure to conduct widespread testing in a prison that has a significant number of cases places the people incarcerated there at risk, as does the failure to medically isolate people who are symptomatic if they either do not have a temperature or do not sign up for sick call.

31. I understand the FCC Butner houses a large population of people who are especially vulnerable to COVID-19 because of their age or medical conditions.

32. Many detainees at FCC Butner, including medically vulnerable detainees, are not able to practice social distancing. I understand that many cells and cubicles are shared by two or more incarcerated people, and that the cells and cubicles are not large enough for people to maintain a distance of six feet apart from each other or from people in the adjacent cubicles. Similarly, based on the declarations, I understand that people incarcerated at FCC Butner are not able to socially distance in the bathrooms, meal lines, medication lines, and in the phone and computer areas. The inability to socially distance places prisoners at increased risk of contracting COVID-19.

33. I also understand that there are many surfaces, including bathroom surfaces, phones and computers, that are touched by many incarcerated people and that they are not disinfected as frequently as they would need to be to prevent the spread of the virus. The failure to routinely and frequently disinfect these high-touch surfaces places prisoners at risk of contracting COVID-19.

34. I understand that masks have been distributed to staff and incarcerated people, but that some staff and some incarcerated people do not wear the masks consistently.

Failure to do wear masks consistently places prisoners at increased risk of infection.

35. I understand that staff and some incarcerated people move between housing units. I understand that there are incarcerated people who go to jobs in areas outside the housing unit in which they live, and that they are in close proximity to people from other housing units when they are in these jobs. It is my understanding that two incarcerated people who were working in the kitchen in the low security facility, where food is prepared for all areas of the low security facility, were recently taken out of the kitchen because they had fevers and were placed in the solitary confinement unit where people are placed if they are believed to have COVID-19. It is further my understanding that there is an incarcerated person whose job it is to clean the solitary confinement unit where people believed to have COVID-19 are housed, who then returns to his housing unit after his work is complete. I understand that staff move between housing units as they conduct counts and do other tasks. People moving between housing units increases the likelihood of spread of the virus within a facility.

36. I understand that people who are believed to have contracted COVID-19 are placed in solitary confinement cells. I understand that the solitary confinement cells are dirty.

37. I understand that some people who are transferred into FCC Butner are quarantined in the same unit that houses people who are undergoing treatment for cancer. Unless these individuals who are quarantined have a separate ventilation system, this is an extremely dangerous practice for the people who are undergoing treatment for cancer.

38. Under these conditions, incarcerated people cannot practice social distancing or good hygiene, nor can they frequently disinfect shared surfaces. The incarcerated people at FCC Butner are unable to take basic steps to protect themselves from the virus. There is a high risk that an ever-growing number of incarcerated people at FCC Butner will become infected with COVID-19, which means that all of them, and particularly the medically vulnerable people face a grave risk of death or serious illness.

39. In my opinion, the only viable course of action is risk mitigation, and the best form of risk mitigation for medically vulnerable people is to release them from FCC Butner, given the heightened risks to their health and safety.

40. Release of the most vulnerable people also reduces the burden on the health care infrastructure within FCC Butner, because the released people will not require treatment related to COVID-19 infection and will no longer require treatment for underlying conditions. Releasing medically vulnerable incarcerated people also reduces the burden on nearby hospitals, which will otherwise need to treat these

7

individuals when infected, freeing up those resources to treat other members of the public.

41. Releasing as many incarcerated people as possible is important to protect the health of incarcerated people, staff, health care workers at the prison, and the community as a whole.

42. Medically vulnerable incarcerated people at FCC Butner should be released to the extent and as soon as possible. Those incarcerated people should be released to a place where they can be appropriately quarantined for at least 14 days and receive any necessary healthcare for underlying chronic conditions.

43. To protect people who remain incarcerated at FCC Butner, the facility must make changes to its practices to ensure that incarcerated people can socially distance effectively, that those incarcerated can wash their hands frequently, that shared common spaces and surfaces can be adequately cleaned and disinfected, and to ensure that quarantine and isolation, testing, and contact tracing practices are medically sound.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day in May 2020 in Alameda County, CA.

Joe Goldenson, M.D.

## CURRICULUM VITAE

**JOE GOLDENSON, MD**
**1406 CYPRESS STREET**
**BERKELEY, CA 94703**
**(510) 557-1086**
**jgoldenson@gmail.com**

## EDUCATION

### Post Graduate Training

| | |
|---|---|
| February 1992 | University of California, San Francisco, CPAT/APEX Mini-Residency in HIV Care |
| 1979-1980 | Robert Wood Johnson Fellowship in Family Practice |
| 1976-1979 | University of California, San Francisco Residency in Family Practice |

### Medical School

| | |
|---|---|
| 1973-1975 | Mt. Sinai School of Medicine, New York M.D. Degree |
| 1971-1973 | University of Michigan, Ann Arbor |

### Undergraduate Education

| | |
|---|---|
| 1967-1971 | University of Michigan, Ann Arbor B.A. in Psychology |

## PROFESSIONAL EXPERIENCE

### Practice Experience

| | |
|---|---|
| 1993-2015 | Director/Medical Director Jail Health Services San Francisco Department of Public Health |
| 1991-1993 | Medical Director Jail Health Services San Francisco Department of Public Health |
| 1990-1991 | Chief of Medical Services, Hall of Justice Jail Health Services San Francisco Department of Public Health |
| 1987-1990 | Staff Physician Jail Health Services San Francisco Department of Public Health |
| 1980-1987 | Sabbatical |
| 1975-1976 | Staff Physician United Farm Workers Health Center, Salinas, CA |

<u>Consulting</u>

| | |
|---|---|
| 6/16-8/19 | Consultant to Los Angeles Department of Health Services re: provision of health care services in the LA County Jail |
| 4/02-Present | Federal Court Medical Expert, *Plata v. Newsome*, Class Action Lawsuit re: prisoner medical care in California State Prison System |
| 6/14-9/14 | Medical expert for the Illinois Department of Corrections and the ACLU of Illinois |
| 6/10-12/13 | Federal Court appointed Medical Monitor, *U.S.A. v. Cook County, et al*, United States District Court for the Northern District of Illinois, No. 10 C 2946, re: medical care in the Cook County Jail |
| 6/08-6/12 | Member, *Plata v. Schwarzenegger* Advisory Board to the Honorable Thelton E. Henderson, U.S. District Court Judge |
| 5/08-9/09 | Medical Expert for ACLU re Maricopa County Jail, Phoenix, AZ |
| 1/08 | Member of the National Commission on Correctional Health Care's Technical Assistance Review Team for the Miami Dade Department of Corrections |
| 9/07-1/10 | Federal Court appointed Medical Expert, *Herrera v. Pierce County, et al*, re: medical care at the Pierce County Jail, Tacoma, WA |
| 8/06-8/12 | State Court Appointed Medical Expert, *Farrell v. Allen*, Superior Court of California Consent Decree re medical care in the California Department of Juvenile Justice |
| 6/05 | Member of Technical Assistance Review Team for the Dallas County Jail |
| 11/02-4/03 | Medical Expert for ACLU re Jefferson County Jail, Port Townsend, Washington |
| 4/02-8/06 | Federal Court Medical Expert, *Austin, et. al vs Wilkinson, et al*, Class Action Law Suit re: Prisoner medical care at the Ohio State Penitentiary Supermax Facility |
| 1/02-3/02 | Consultant to the Francis J. Curry, National Tuberculosis Center re: *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, |
| 8/01-4/02 | Medical Expert for ACLU re Wisconsin Supermax Correctional Facility, Boscobel, WI |
| 7/01-4/02 | Medical Expert for Ohio Attorney General's Office re Ohio State Prison, Youngstown, OH |
| 1/96-1/14 | Member and Surveyor, California Medical Association Corrections and Detentions Health Care Committee |
| 5/95-6/08 | Medical Expert for the Office of the Special Master, *Madrid vs Alameida*, Federal Class Action Law Suit re: Prisoner medical care at the Pelican Bay State Prison Supermax Facility |
| 3/98-12/98 | Member, Los Angeles County Department of Public Health Jail Health Services Task Force |

| | |
|---|---|
| 2/98 | Medical Expert, Department of Justice Investigation of Clark County Detention Center, Las Vegas, Nevada |
| 6/94 | Surveyor, National Commission on Correctional Health Care, INS Detention Center, El Centro, CA |

<u>Work Related Committees</u>

| | |
|---|---|
| 1/14 to present | Member, Editorial Advisory Board, *Correctional Health Care Report* |
| 10/11 to 5/19 | Member, Board of Directors of the National Commission on Correctional Health Care |
| 5/07-10/12 | Liaison to the CDC Advisory Council for the Elimination of Tuberculosis (ACET) from the National Commission on Correctional Health Care |
| 12/04-3/06 | Member of the CDC Advisory Council for the Elimination of Tuberculosis (ACET) Ad Hoc Working Group on the *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (MMWR 2006; 55(No. RR-9)) |
| 6/03-8/03 | Member of the Advisory Panel for the Francis J. Curry National Tuberculosis Center and National Commission on Correctional Health Care, 2003: *Corrections Tuberculosis Training and Education Resource Guide* |
| 3/02-1/03 | Member of the Advisory Committee to Develop the *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, Francis J. Curry, National Tuberculosis Center |
| 6/01-1/15 | Director's Cabinet San Francisco Department of Public Health |
| 3/01 | Consultant to Centers for Disease Control on the Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings (MMWR 2003; 52(No. RR-1)) |
| 9/97-6/02 | Member, Executive Committee of Medical Practice Group, San Francisco Department of Public Health |
| 3/97-3/02 | American Correctional Health Services Association Liaison with American Public Health Association |
| 3/96-6/12 | Chairperson, Bay Area Corrections Committee (on tuberculosis) |
| 2/00-12/00 | Medical Providers' Subcommittee of the Office-based Opiate Treatment Program, San Francisco Department of public Health |
| 12/98-12/00 | Associate Chairperson, Corrections Sub-Committee, California Tuberculosis Elimination Advisory Committee |
| 7/94-7/96 | Advisory Committee for the Control And Elimination of Tuberculosis, San Francisco Department of Public Health |
| 6/93-6/95 | Managed Care Clinical Implementation Committee, San Francisco Department of Public Health |
| 2/92-2/96 | Tuberculosis Control Task Force, San Francisco Department of Public Health |
| 3/90-7/97 | San Francisco General Hospital Blood Borne Pathogen Committee |

1/93-7/93                Medical Staff Bylaws Committee, San Francisco Department of
                        Public Health


ACADEMIC APPOINTMENT
1980-2015               Assistant Clinical Professor
                        University of California, San Francisco


PROFESSIONAL AFFILIATIONS
Society of Correctional Physicians, Member of President's Council, Past-Treasurer and
Secretary
American Correctional Health Services Association, Past-President of California
Chapter
American Public Health Association, Jails and Prison's Subcommittee
Academy of Correctional Health Professionals


PROFESSIONAL PRESENTATIONS
*Caring for the Inmate Health Population: A Public Health Imperative,* Correctional Health
Care Leadership Institutes, July 2015
*Correctional Medicine and Community Health,* Society of Correctional Physicians Annual
Meeting, October, 2014
*Identifying Pulmonary TB in Jails: A Roundtable Discussion,* National Commission on
Correctional Health Care Annual Conference, October 31, 2006
*A Community Health Approach to Correctional Health Care,* Society of Correctional
Physicians, October 29, 2006
*Prisoners the Unwanted and Underserved Population, Why Public Health Should Be in Jail,*
San Francisco General Hospital Medical Center, Medical Grand Rounds, 10/12/04
*TB in Jail: A Contact Investigation Course, Legal and Administrative Responsibilities,* Francis
J. Curry National Tuberculosis Center, 10/7/04
*Public Health and Correctional Medicine,* American Public Health Association Annual
Conference, 11/19/2003
*Hepatitis in Corrections,* CA/NV Chapter, American Correctional Health Services
Association  Annual Meeting, 1/17/02
*Correctional Medicine,* San Francisco General Hospital Medical Center, Medical Grand
Rounds, 12/16/02
*SuperMax Prisons,* American Public Health Association Annual Conference, 11/8/01
*Chronic Care Programs in Corrections,* CA/NV Chapter, American Correctional Health
Services Association  Annual Meeting, 9/19/02
*Tuberculosis in Corrections - Continuity of Care,* California Tuberculosis Controllers
Association Spring Conference, 5/12/98
*HIV Care Incarcerated in Incarcerated Populations,* UCSF Clinical Care of the AIDS Patient
Conference, 12/5/97
*Tuberculosis in Correctional Facilities,* Pennsylvania AIDS Education and Training Center,
3/25/93

*Tuberculosis Control in Jails*, AIDS and Prison Conference, 10/15/93

*The Interface of Public Health and Correctional Health Care*, American Public Health Association Annual Meeting, 10/26/93

*HIV Education for Correctional Health Care Workers*, American Public Health Association Annual Meeting, 10/26/93

## PUBLICATIONS

*Structure and Administration of a Jail Medical Program*. Correctional Health Care: Practice, Administration, and Law. Kingston, NJ: Civic Research Institute. 2017.

*Structure and Administration of a Jail Medical Program – Part II*. Correctional Health Care Report. Volume 16, No. 2, January-February 2015.

*Structure and Administration of a Jail Medical Program – Part I*. Correctional Health Care Report. Volume 16, No. 1, November-December 2014.

*Pain Behind Bars: The Epidemiology of Pain in Older Jail Inmates in a County Jail*. Journal of Palliative Medicine. 09/2014; DOI: 10.1089/jpm.2014.0160

*Older jail inmates and community acute care use*. Am J Public Health. 2014 Sep; 104(9):1728-33.

*Correctional Health Care Must be Recognized as an Integral Part of the Public Health Sector*, Sexually Transmitted Diseases, February Supplement 2009, Vol. 36, No. 2, p.S3-S4

*Use of sentinel surveillance and geographic information systems to monitor trends in HIV prevalence, incidence, and related risk behavior among women undergoing syphilis screening in a jail setting*. Journal of Urban Health 10/2008; 86(1):79-92.

*Discharge Planning and Continuity of Health Care: Findings From the San Francisco County Jail*, American Journal of Public Health. 98:2182–2184. 2008

*Public Health Behind Bars*, Deputy Editor, Springer, 2007

*Diabetes Care in the San Francisco County Jail*, American Journal of Public Health. 96:1571-73, 2006

*Clinical Practice in Correctional Medicine, 2nd Edition*, Associate Editor, Mosby, 2006.

*Tuberculosis in the Correctional Facility*, Mark Lobato, MD and Joe Goldenson, MD, Clinical Practice in Correctional Medicine, 2nd Edition, Mosby, 2006.

*Incidence of TB in inmates with latent TB infection: 5-year follow-up*. American Journal of Preventive Medicine. 11/2005; 29(4):295-301.

*Cancer Screening Among Jail Inmates: Frequency, Knowledge, and Willingness*. Am J Public Health. 2005 October; 95(10): 1781–1787

*Improving tuberculosis therapy completion after jail: translation of research to practice*. Health Education Research. 05/2005; 20(2):163-74.

*Incidence of TB in Inmates with Latent TB Infection, 5-Year Follow-up*, American Journal of Preventive Medicine, 29(4), 2005

*Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings*, Morbidity and Mortality Reports, (External Consultant to Centers for Disease Control),Vol. 52/No. RR-1 January 24, 2003

*Randomized Controlled Trial of Interventions to Improve Follow-up for Latent*

*Tuberculosis Infection After Release from Jail,* Archives of Internal Medicine, 162:1044-1050, 2002

*Jail Inmates and HIV care: provision of antiretroviral therapy and Pneumocystis carinii pneumonia prophylaxis,* International Journal of STD & AIDS, 12: 380-385, 2001

*Tuberculosis Prevalence in an urban jail: 1994 and 1998,* International Journal of Tuberculosis Lung Disease, 5(5):400-404, 2001

*Screening for Tuberculosis in Jail and Clinic Follow-up after Release,* American Journal of Public Health, 88(2):223-226, 1998

*A Clinical Trial of a Financial Incentive to Go to the Tuberculosis Clinic for Isoniazid after Release from Jail,* International Journal of Tuberculosis Lung Disease, 2(6):506-512,1998

## AWARDS
Armond Start Award of Excellence, Society of Correctional Physicians, 2014
Award of Honor, San Francisco Board of Supervisors, 2014
Award of Honor, San Francisco Health Commission, 2014
Certificate of Appreciation, San Francisco Public Defender's Office, 2014
Certificate for Excellence in Teaching, California Department of Health Services, 2002
Employee Recognition Award, San Francisco Health Commission, July 2000
Public Managerial Excellence Award, Certificate of Merit, San Francisco, 1997

## LICENSURE AND CERTIFICATION
Medical Board of California, Certificate #A32488
Fellow, Society of Correctional Physicians
Board Certified in Family Practice, 1979-1986 (Currently Board Eligible)

(EXHIBIT F)

**9 DEAD**

| | | | |
|---|---|---|---|
| JOSE | VIZOSO | 5-23-1951 | 1-1-2020 |
| ALLAN | LIBBERT | 12-23-1973 | 1-4-2020 |
| HOWARD | SMITH | 1-14-1970 | 1-8-2020 |
| HILRAY | LUCAS | 4-17-1953 | 1-10-2020 |
| KENNETH | PATTERSON | 6-13-1959 | 1-12-2020 |
| WILLIAM | POSEY | 4-17-1947 | 1-14-2020 |
| MOISES | MUNGIA | 9-11-1958 | 1-18-2020 |
| ERWIN | PLENTY CHIEF | 5-1-1979 | 1-21-2020 |
| MICHAEL | JOHNSON | 8-21-1953 | 1-30-2020 |

**6 DEAD**

| | | | |
|---|---|---|---|
| WILLIE | BRANCH | 3-13-1956 | 2-5-2020 |
| JACK | SPORICH | 5-24-1934 | 2-8-2020 |
| BORIS | ROBERTS | 4-2-1956 | 2-20-2020 |
| ISAAC | SMATHERS | 11-28-1946 | 2-21-2020 |
| CHARLIE | WILLIAMS | 3-29-1946 | 2-23-2020 |
| ANDREW | BARTOK | 10-7-1946 | 2-25-2020 |

**11 DEAD**

| | | | |
|---|---|---|---|
| TYRONE | VANNOY | 10-13-1964 | 3-2-2020 |
| MARSHALL | MCIE | 3-4-1958 | 3-4-2020 |
| WARREN | GLADDERS | 3-18-1949 | 3-6-2020 |
| SAMUEL | RIOS | 6-13-1960 | 3-11-2020 |
| NICHOLAS | DICKINSON | 2-7-1982 | 3-13-2020 |
| EDWIN | TOWNE | 3-8-1952 | 3-15-2020 |
| MARTIN | EBENHACK | 5-24-1942 | 3-17-2020 |
| MARK | CHANLEY | 2-28-1959 | 3-22-2020 |
| CLETO | TARIN | 5-15-1963 | 3-26-2020 |
| LEROY | PORTER | 11-8-1952 | 3-28-2020 |
| STEPHEN | BERNIER | 7-23-1964 | 3-29-2020 |

**12 DEAD**

| | | | |
|---|---|---|---|
| NARAYAN | THADANI | 4-9-1947 | 4-3-2020 |
| PHILLIP | RISTER | 7-10-1946 | 4-8-2020 |
| EDWARD | OKUN | 1-4-1951 | 4-9-2020 |
| CHARLES | ROOTES | 3-23-1939 | 4-11-2020 |
| RONALD | BARMORE | 2-6-1951 | 4-12-2020 |
| ANDRE | WILLIAMS | 6-19-1941 | 4-12-2020 |
| GARY | NIXON | 11-6-1962 | 4-12-2020 |
| JOHN | DOE | 2-19-1974 | 4-13-2020 |
| FABIAN | TINSLEY | 6-22-1952 | 4-16-2020 |
| WILLIAM | FIGUEROA | 6-2-1956 | 4-20-2020 |
| ULYSSES | JONES | 9-16-1956 | 4-25-2020 |
| WILLIAM | MINTO | 5-6-1946 | 4-28-2020 |

(EXHIBIT P)

**13 DEAD**

| | | | |
|---|---|---|---|
| WILLIAM | MILLER | 11-8-1961 | 5-6-2020 |
| EARNEST | FORD | 11-24-1943 | 5-9-2020 |
| JERRY | DEMPSEY | 6-1-1960 | 5-15-2020 |
| ALBERT | ALLEN | 6-3-1955 | 5-18-2020 |
| JAMES | BRYANT | 10-28-1946 | 5-18-2020 |
| PAUL | KINCAID | 3-3-1941 | 5-20-2020 |
| SCOTTY | WATSON | 7-3-1984 | 5-23-2020 |
| ERIC | SPIWAK | 11-20-1946 | 5-25-2020 |
| ISAAC | BYERS | 3-7-1968 | 5-26-2020 |
| DONGFAN | CHUNG | 1-20-1936 | 5-28-2020 |
| BERNARDO | LOAIZA | 9-9-1956 | 5-28-2020 |
| STEVE | ROBINETTE | 7-15-1940 | 5-30-2020 |
| DAVID | GRANT | 3-15-1957 | 5-31-2020 |

**12 DEAD**

| | | | |
|---|---|---|---|
| JUAN | MORENO | 3-31-1946 | 6-1-2020 |
| BOBBY | MEDFORD | 7-30-1945 | 6-3-2020 |
| ANDREW | MARKOVCI | 11-24-1963 | 6-4-2020 |
| JOHN | BRUST | 1-9-1943 | 6-5-2020 |
| RUSSELL | ELLIS | 8-10-1959 | 6-13-2020 |
| JOHN | MARRONE | 6-7-1935 | 6-14-2020 |
| MARK | HEBERT | 8-22-1958 | 6-14-2020 |
| WAYNE | LITTLECROW | 8-31-1964 | 6-20-2020 |
| JOE | TAPIA III | 5-19-1965 | 6-23-2020 |
| NORMAN | GRIMM | 8-2-1953 | 6-24-2020 |
| ED | MENDOZA | 10-2-1955 | 6-28-2020 |
| ROBERT | RHODES | 10-6-1956 | 6-30-2020 |

**5 DEAD**

| | | | |
|---|---|---|---|
| JOHN | DAILEY | 9-2-1957 | 7-3-2020 |
| JACK | TALLEDO | 12-14-1958 | 7-4-2020 |
| WALTER | LEWIS | 12-16-1956 | 7-8-2020 |
| KENNETH | PITTMAN | 3-14-1969 | 7-10-2020 |
| CHRISTOPHER | FIORE | 12-15-1966 | 7-25-2020 |

**5 DEAD**

| | | | |
|---|---|---|---|
| RONALD | BROWN | 7-11-1955 | 8-5-2020 |
| SAMUEL | VRETTA | 1-1-1923 | 8-13-2020 |
| ELISO | GONZALEZ | 1-7-1972 | 8-13-2020 |
| DENNIS | GRIGSBY | 7-8-1966 | 8-14-2020 |
| TROY | SHERRELL | 4-29-1963 | 8-21-2020 |

**7 DEAD**

| | | | |
|---|---|---|---|
| ISAAC | BARLOW | 1-12-1948 | 9-1-2020 |
| KENOSHA | DINO | 4-21-1970 | 9-4-2020 |

APPENDIX A
(EXHIBIT F)

| | | | |
|---|---|---|---|
| RICHARD | HARRIS | 4-25-1956 | 9-5-2020 |
| JOHN | MILLS | 4-19-1946 | 9-14-2020 |
| RICKY | MILLER | 8-5-1958 | 9-17-2020 |
| WILLIAM | HEWLETT | 1-27-1944 | 9-19-2020 |
| DONALD | SNYDER | 10-25-1954 | 9-19-2020 |

**5 DEAD**

| | | | |
|---|---|---|---|
| ERNEST | ROWLAND | 7-21-1953 | 10-5-2020 |
| VINOD | SHAH | 12-5-1949 | 10-5-2020 |
| PETER | MELENDEZ | 8-5-1960 | 10-16-2020 |
| ROY | REEVES | 11-6-1959 | 10-27-2020 |
| DAVID | WARD | 11-21-1957 | 10-27-2020 |

**7 DEAD**

| | | | |
|---|---|---|---|
| RICHARD | MENDOZA | 10-25-1968 | 11-6-2020 |
| LOUIS | RECTOR | 12-25-1957 | 11-12-2020 |
| EDWARD | SAMBRANO | 11-6-1966 | 11-14-2020 |
| MARCOS | CASTANEDA | 6-8-1944 | 11-16-2020 |
| BRIAN | DOTSON | 6-28-1960 | 11-18-2020 |
| ERIC | ROBLES | 3-17-1975 | 11-23-2020 |
| AGUSTIN | RIVERA | 12-6-1956 | 11-24-2020 |

**1 DEAD**

| | | | |
|---|---|---|---|
| CHARLES | COLLINS | 4-21-1953 | 12-4-2020 |

**TOTAL DEAD: 93**

TRULINCS  67742018 - GAYDEN, JOHN MATTHEW JR - Unit: BUF-V-A    *(EXHIBIT G)*

---------------------------------------------------------------------------------

FROM: 67742018
TO:
SUBJECT: Re: laboratory testing of indoor air and water
DATE: 01/09/2022 06:10:21 PM

Melinda King,Warden LSCI,Butner
Safety Officer McCulley

This is a request for independent laboratory testing to do an indoor air analysis in Vance A,Butner low for radon gas to be measured in picocuries per liter of air.This is also a request for independent laboratory testing to do a indoor water analysis from Vance A,Butner low,for radon,trihalomethane,and for all known carcinogens above indoor (EPA)Environmental Protection Agency guidelines.Previous indoor water analysis at Butner revealed eight (8) carcinogens including trihalomethane(9 ppm). A normal level is below (7ppm). Please inform me the results by providing me with a copy of the reports.

   BACKGROUND

In 1972 the National Academy of sciences committee on biological effects of ionizing radiation revealed the cancer rate among American workers was directly related to their degree of exposure to radon gas calculated by the concentration of in air of radon and the length of time of exposure.One study reported an incident rate of lung cancer due to radon gas for an incarcerated group of (10%) ten percent above the control group outside of prison when adjusted for age,gender,and race.Radon gas levels at 4.0 picocuries per liter of air or above require mitigation of the ventilation system to make the level less severe as required by the (EPA) Environmental Protection Agency "clean air act".Butner was built after 1988 on a hazardous waste dump when the risk of radon indoor air was well known,but was sited and constructed without testing or mitigation.Radon gas is included in the EPA's "TOXIC SUBSTANCE CONTROL ACT."Granville county and Butner according to section 307 and 309 of the (IRAA)Indoor Radon abatement act map in 1988 predicted an indoor air analysis of radon gas between 2.0 and 4.0 picocuries per liter of air.Radon gas levels at 4.0 picocuries per liter of air or above require mitigation according to the EPA's clean air act to reduce radon exposure with proven methods of mitigation of the ventilation system to make the level of radon gas less severe.

TRULINCS  67742018 - GAYDEN, JOHN MATTHEW JR - Unit: COL-B-A

--------------------------------------------------------------------------------------------------

FROM: 67742018
TO:
SUBJECT: Water And Ventilation system at Butner/Coleman
DATE: 03/18/2022 08:04:57 PM

(EXHIBIT G)

American Correctional Association
206 N.Washington St.
Alexandria,Va.22314          March 17,2022

Dear Sir,

I have symptoms of chronic coughing,runny nose,sneezing,and itchy eyes and nose suggestive of hypersensitivity
to a Sick Building Syndrome in the air of the ventilation systems of FCC Butner low and FCC Coleman low.The majority
of the inmates in these open bay units have these symptoms.Because the EPA has designated Butner a category two
area for radon and Coleman a category three area for radon in water and air. I am concerned about lung cancer as a
higher incidence of lung cancer occurs in prisons compared to outside populations with the same ages,sex and race.
Please tell me if ACA tests for radon in the open bay units at Butner low and Coleman low.Please send me a copy of the last
two of your every three year tests of these air ventilation systems and water in open bay units at Butner low and
Coleman low.Thank you for your cooperation.

Sincerely,
John Matthew Gayden, Jr.,M.D.
John Matthew Gayden,Jr.,M.D.
#67742-018
FCC Coleman low,B-1
P.O.Box 1031
Coleman,Florida 33521-1031

(EXHIBIT G)

## NOTICE TO THE PUBLIC

## IMPORTANT INFORMATION ABOUT YOUR DRINKING WATER

### SGWASA HAS LEVELS OF TOTAL TRIHALOMETHANES ( TTHMs )
### ABOVE DRINKING WATER STANDARDS

Our water system recently violated a drinking water standard. Although this is not an emergency, as our customers, you have a right to know what happened, what you should do, and what we are doing to correct this situation.

We routinely monitor for the presence of drinking water contaminants. Testing results for water samples collected during the time period ending June 30,2017 show that the contaminant concentration from one or more sampling locations exceeds the standard or maximum contaminant level (MCL)for TOTAL TRIHALOMETHANES (TTHMs).The standard for TOTAL TRIHALOMETHANES is 0.080 milligrams per liter (mg/L). Over the referenced compliance period, the sample location with the highest average level of TOTAL TRIHALOMETHANES had a concentration of 0.095 mg/l.

#### What should I do?
You do not need to use an alternative (e.g., bottled) water supply. However, if you have specific health concerns, consult your doctor.

#### What does this mean?
This is not an immediate risk. If it had been, you would have been notified immediately. *However, some people who drink the water containing* Total Trihalomethanes (TTHMs) *in excess of the MCL over many years may have an increased risk of getting cancer.*

#### What happened?  What is being done?  When will the problem be corrected?
Test results for SGWASA's TOTAL TRIHALOMETHANES (TTHMs) sample for the sample taken on May 25, 2017 show the quarterly concentration at this location to be 0.095 mg/L . An investigation as to the cause of the elevated (TTHMs) level is ongoing and will continue until system compliance is achieved.

*Please share this information with all the other people who drink this water, especially those who may not have received this notice directly (for example, people in apartments, nursing homes, schools, and businesses). You can do this by posting this notice in a public place or distributing copies by hand or mail.*

For more information, please contact:

| Responsible Person | System Name | System Address (Street) |
|---|---|---|
| Fred Dancy | SGWASA | 415 Central Ave. Suite B |
| Phone Number | System PWSID# | System Address (City, State, Zip) |
| 919-575-3118 | 02-39-107 | Butner, N.C. 27509 |

Violation Awareness Date: July 20, 2017

Date Notice Distributed:    August 19, 2017    Method of Distribution: Mailing

---

**Public Notification Certification:**

The public water system named above hereby affirms that public notification has been provided to its consumers in accordance with all delivery, content, format, and deadline requirements specified in 15A NCAC 18C .1523.

Owner/Operator:    _Lindsay L. Mize_
                      (Signature)

Lindsay L. Mize
(Print Name)

August 15, 2017
(Date)

CLAGETT III CHARLES 2700MMC

TRULINCS  67742018 - GAYDEN, JOHN MATTHEW JR - Unit: COL-B-A          *EXHIBIT A*

--------------------------------------------------------------------------------

FROM: 67742018
TO:
SUBJECT: BP-A0148 February 11,2022
DATE: 03/20/2022 01:17:13 PM

Stephen Clements,Acting Warden FCC Coleman Low

This is a request for reduction in sentence according to the Department of Justice,Attorney General Merrick Garland's
Memorandum 12-21-2021 regarding the ongoing covid-19 pandemic and afterward. The existence of petitioners CDC
listed medical condition of Frontal Temporal Dementia(FTD)makes petitioner highly vulnerable to severe illness and
death from contracting covid-19.Petitioner is a 68 year old elderly inmate also making petitioner vulnerable to severe illness and
death from contracting covid-19.(Per https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical
conditions.html,updated 2-22-2021.)According to Attorney General Merrick Garland's memorandum
petitioner's high risk factors,which are material fact,are all that is required for "extraordinary and compelling reasons"
to grant compassionate release under 18 U.S.C. section 3582(c)(1)(A)"other reasons.""Petitioners length of sentence and
amount of time served no longer prevents petitioner from home confinement." Lopez,19-cr-00429-WJMCDcolo
(3-23-2020) "correctional facilities,like cruse ships and long term care facilities simply are not designed for inmates to
practice social distancing.
(1)Petitioner is a first time,nonviolent offender with no history of any other criminal conduct.
(2)Petitioner has no history of drug use.
(3)Petitioner has been scored by the BOP/Justice Department a "minimal" risk/recidivism to the safety of any other person or to
the community.
(4)Petitioner resides at a low security correctional institution.
(5Petitioner's release plan is to be with my wife Melissa Madden Gayden and eight year old son at 608 Mango
Drive,MelbourneBeach,Florida 32951.
(6)Petitioner has Medicare health insurance.
(7)Petitioner has Social Security retirement income.
(8)Petitioner will receive medical care at Health First Holmes Regional Medical Center,Melbourne,Florida.

#67742-018
ELL COLEMAN LOW, B-1
P.O. BOX 1031
COLEMAN FL 33521-1031

LEGAL
MAIL

PRIORITY
★ MAIL ★

For Domestic and International Use

UNITED STATES
POSTAL SERVICE®

Label 107R, May 2014

TRACKED
INSURED
★ ★ ★

PRIORITY MAIL 2-DAY®

$0.00

retail
1117500

EXPECTED DELIVERY DAY: 03/28/22

0 Lb 10.70 Oz

1006

C029

USPS TRACKING® #

9505 5126 3316 2084 3720 60

SHIP
TO:
207 NW 2ND ST
RM 337
OCALA FL 34475-6666

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION
GOLDEN-COLLUM MEMORIAL FEDERAL BUILDING
AND U.S. COURTHOUSE
OFFICE OF THE CLERK
207 N.W. SECOND STREET, ROOM 337
OCALA, FL 34475-6666

SCREENED
BY USMS

